1

2

3

4

5

6

7                        IN THE UNITED STATES DISTRICT COURT

8                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   THOMAS O. MORGAN, ET AL.,
                                                    No. C 04-4362 MJJ
11              Plaintiffs,                          No. C 05-5106 MJJ

12        v.                                        **ORDER DISMISSING PLAINTIFF'S**
                                                    **COMPLAINT WITHOUT PREJUDICE**
13
     AXT, INC. and MORRIS S. YOUNG,
14
                Defendants.
15   _____/

16

17                                  **INTRODUCTION**

18        Before the Court is Defendants' motion to dismiss this private securities fraud action.

19   Plaintiff Thomas O. Morgan ("Plaintiff"),[1] representing a purported class of all purchasers of AXT,

20   Inc., stock between February 6, 2001, and April 27, 2004, opposes the motion.  For the following

21   reasons, the Court **GRANTS** Defendants' motion to dismiss, but **GRANTS** Plaintiff leave to amend.

22                              **FACTUAL BACKGROUND**

23   **A.     Background**

24        Defendant AXT, Inc.'s ("AXT" or the "Company") is a publicly-traded company that

25   manufactures semiconductor parts, known as substrates, used by a variety of electronic products

26   including wireless and fiber optic telecommuncations, lasers, light emitting diodes, satellite solar

27   cells, and consumer electronics such as cell phones.  AXT sells compound semiconductor non-

28

     _____
          [1] In an Order dated February 2, 2005, the Court granted Plaintiff Morgan's motion for
     appointment as lead plaintiff.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   silicon substrates manufactured from gallium arsenide, indium phosphide, and germanium.  AXT

2   employs its proprietary Vertical Gradient Freeze method for manufacturing the non-silicon

3   substrates.  During the period of time at issue in the instant lawsuit (February 6, 2001, through April

4   27, 2004 (the "Class Period")), AXT also produced and sold light-emitting diodes ("LEDs") and

5   vertical cavity surface emitting laser chips through its opto-electronic division.  AXT sold its

6   products to original equipment manufacturers ("OEMs").  The particular testing required and

7   characteristics of those AXT products were determined by the OEMs.  Defendant Dr. Morris S.

8   Young ("Defendant Young") served as the Company's CEO and Chairman of the Board during the

9   Class Period.

10          On February 6, 2001, AXT issued a press release reporting the Company's strong

11   commitment to its customers and touting AXT's customers' confidence in AXT.  The press release

12   referenced the Company's "supply of high quality substrates" and reported that AXT was "pleased

13   to support [its] strategic customers' substrate requirements for the year and believe[d] that the value

14   of the contracts under th[e] [Supply Guarantee Program] is a good indicator of [AXT's] ability to

15   deliver continued revenue and profit expansion."  (Complaint ("Comp."), ¶ 31.)

16          On February 26, 2001, the Company filed its annual report for FY 2000 on Form 10-K with

17   the SEC.  The 10-K stated: "We believe that our success is partially due to our manufacturing

18   efficiency and high product yields and we continually emphasize quality and process control

19   throughout our manufacturing operations."  The 10-K also explained that AXT's policy was to

20   recognize revenue when its products were shipped to the customer as long as, *inter alia*, there are no

21   customer acceptance requirements and no remaining significant obligations.  (*Id.*, ¶ 32.)

22          On April 25, 2001, AXT issued a press release announcing its financial results for the first

23   quarter of 2001.  The Company reported that revenue was up a record $40.1 million and that net

24   income was up $5 million.  In the press release, AXT expressed its belief that its products' "strong

25   engineering design and development capability allows [AXT] to tailor [its] standard products to

26   meet customer specific requirements and gives [AXT] competitive advantages."  (Comp., ¶ 33.)  On

27   May 3, 2001, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's

28   previously announced financial results for the first quarter of 2001.

**United States District Court**
For the Northern District of California

1          On July 25, 2001, AXT issued a press release announcing its financial results for the second

2   quarter of 2001.  The Company reported that revenue reached a record $41.3 million and that net

3   income was up $5.2 million.  On August 1, 2001, AXT filed its quarterly report on Form 10-Q with

4   the SEC, reaffirming the Company's previously announced financial results for the second quarter of

5   2001.

6          On October 24, 2001, AXT issued a press release announcing its financial results for the

7   third quarter of 2001.  The Company announced that reported net losses for the quarter but stated

8   that "strategic research and development investments are positioning AXT well for continued

9   leadership" and that the Company's "VFG gallium arsenide and indium phosphide substrates

10  continue to offer superior features for manufacturers of high quality electronic and opto-electronic

11  devices."  The press release went on to say that AXT "believe[s] that [it] remain[s] the world leader

12  in providing both products."  (Comp., ¶ 38.)  On November 7, 2001, AXT filed its quarterly report

13  on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for

14  the third quarter of 2001.

15         On February 6, 2002, AXT issued a press release announcing its financial results for the

16  fourth quarter of 2001 and for FY 2001.  The Company again reported that its specialized substrates

17  "continue to offer superior features for manufacturers of high quality electronic and opto-electronic

18  devices" and that the Company "expect[ed] an increasing number of key customers to recognize the

19  superiority of [AXT's] technology in the future."  (*Id*., ¶ 40.)  On March 26, 2002, AXT filed its

20  Form 10-K annual report with the SEC, reaffirming the Company's previously announced financial

21  results for the fourth quarter and for FY 2001, and including the same description of AXT's revenue

22  recognition policy described in its FY 2000 annual report.

23         On April 24, 2002, AXT issued a press release announcing its financial results for the first

24  quarter of 2002.  The Company reported net losses for the quarter but stated that its reputation for

25  LED quality, value, and delivery was growing.  On May 3, 2002, AXT filed its quarterly report on

26  Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the

27  first quarter of 2002.

28         On July 24, 2002, AXT issued a press release announcing its financial results for the second

quarter of 2002.  The Company reported that revenue increased 14 % and stated, "We are particularly pleased with the growth of our LED division, which has recorded double digit revenue growth for the past three quarters, efficiently increased manufacturing capacity to sustain this growth, improved growth margins, and approached overall profitability."  On August 15, 2002, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the second quarter of 2002.  Defendant Young also filed a certification pursuant to the Sarbanes-Oxley Act that the "information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company."

On October 23, 2002, AXT issued a press release announcing its financial results for the third quarter of 2002.  The Company reported that "AXT will continue to benefit from the strength of our technology."  (Comp., ¶ 48.)  On November 12, 2002, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the third quarter of 2002.  The Form 10-Q also stated that, "Based on their evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures are effective."

On February 5, 2003, AXT issued a press release announcing its financial results for the fourth quarter of 2002 and for FY 2002.  On March 21, 2003, AXT filed its Form 10-K annual report with the SEC.  In the 10-K, the Company stated, "the lives of our substrate products are relatively long and accordingly, obsolescence has historically not been a significant factor."  The Company again described its revenue recognition policy, as it had in its 2000 and 2001 annual reports.  The 10-K also contained a certification, pursuant to the requirements of the Sarbanes-Oxley Act, averring that the report "does not contain any untrue statement of material fact or omit to state a material fact" and that the financial statements" fairly present in all material respects the financial condition" of the Company.

On April 23, 2003, AXT issued a press release announcing its financial results for the first quarter of 2003.  The Company reported net losses for the quarter.  On May 9, 2003, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the first quarter of 2003.  The 10-Q reported certified that the Company's

"disclosure controls and procedures are effective."

On July 23, 2003, AXT issued a press release announcing its financial results for the second quarter of 2004.  The Company reported net losses.  On August 12, 2003, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the second quarter of 2003.  The 10-Q again contained a certification regarding disclosure controls and procedures as the May 10-Q had.

On October 22, 2003, AXT issued a press release announcing its financial results for the third quarter of 2003.  The Company again reported net losses.  On November 13, 2003, AXT filed its quarterly report on Form 10-Q with the SEC, reaffirming the Company's previously announced financial results for the third quarter of 2003, and containing certifications regarding the Company's disclosure controls and procedures.

On February 4, 2004, AXT issued a press release announcing its financial results for the fourth quarter of 2003 and for FY 2003.  On March 29, 2004, AXT filed its Form 10-K annual report with the SEC.  The 10-K certified that the Company's disclosure controls and procedures were effective and that the report contained no "untrue statement[s] of material fact" and did not "omit to state a material fact" and that the financial statements" fairly present in all material respects the financial condition" of the Company.

On April 27, 2004, AXT issued a press release revealing that the "first quarter's financial review and verification process ha[d] been delayed due to an investigation by AXT's Audit Committee of certain product testing practices and policies."  (Comp., ¶ 64.)  The next day, AXT stock dropped by 13.64%.  A day later, AXT's stock dropped further, by nearly 23%, to close at $2.20 per share.

On May 24, 2004, AXT filed its quarterly report on Form 10-Q with the SEC, announcing that AXT had "not followed requirements for testing of products and provision of testing data and information relating to customer requirements for certain shipments made over the past several years."  The 10-Q reported that AXT then increased its reserve for sales returns by $745,000, and recorded a $2.1 million charge for obsolete inventory manufactured in the previous two and three years because the specifications of its products differed from customer orders.  AXT also announced

that it had reassigned its CEO and Chairman of the Board, Defendant Young to head up AXT's

China unit, and had replaced the Company's independent auditor, PriceWaterhouseCoopers

("PwC").  (Comp., ¶¶ 65–68, 70.)  Plaintiff Morgan subsequently filed the instant lawsuit,[2] claiming

that he and other members of the proposed class who purchased shares of AXT stock between

February 6, 2001, and April 27, 2004, were injured because they bought AXT stock at artificially-

inflated prices which plummeted when the Company disclosed to the public the internal

investigation into its practices.

**B.      The Complaint**

        In his Consolidated Complaint for Violations of the Federal Securities Laws (hereinafter, the

"Complaint"), Plaintiff alleges that AXT and Defendant Young, AXT's former Chairman and Chief

Executive Officer, violated §§ 10 (b) and 20 (a) of the Securities and Exchange Act of 1934

("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78(t)a, and Securities and Exchange Commission

("SEC") Rule 10b-5, 17 C.F.R § 240.10b-5.  According to Plaintiff, during the Class Period,

Defendants knowingly shipped products that did not conform to customer testing requirements or

specifications.  Plaintiff alleges that Defendants failed to properly account for products that were

defective or could not be sold by improperly recognizing revenue on those sales even though

Defendants knew the products would be returned and failing to accrue adequate reserves.  Plaintiff

claims that Defendants violated the securities laws by knowingly issuing false or misleading

statements about AXT's reserves, revenue, and income (hereinafter, the "financial statements"), and

by knowingly issuing false or misleading statements touting the quality of AXT's products and

AXT's ability to meet customer requirements (hereinafter, the "quality statements").

        In his Complaint, Plaintiff alleges that his claims are supported by the statements of three

confidential witnesses – a Quality Technician who used to work for AXT, a former AXT Corporate

_____

        [2] Two separate lawsuits were brought by investors in AXT stock against AXT and Defendant
Young:  (1) *City of Harper Woods Employees Retirement Sys. v. AXT, Inc.*, 04-04362 MJJ, filed on
October 15, 2004; and (2) *Robertson v. AXT, Inc.*, 04-05106 MJJ, filed on December 2, 2004.  In its
February 2, 2005, Order, the Court granted Plaintiff Morgan's motion to consolidate the lawsuits.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Vice President, and a former tester of returned AXT products.[3]  The former Quality Technician

2    allegedly confirmed that the Company knowingly shipped to customers products that did not meet

3    customer specifications, that the Company was aware that the products would be returned, and that

4    almost every shipment was, in fact, returned.  Specifically, the technician said that when AXT

5    conducted specification checks on its LED wafers for wavelength, luminosity, vision, and current,

6    the wafers never met all the specifications.  The former tester of returned AXT products allegedly

7    confirmed that the passivation layer (the top protective layer) on AXT's LEDs was consistently

8    weak, making the LEDs easily and irreparably damaged.  The tester allegedly said that AXT knew

9    this was a problem and lacked adequate product testing equipment.  The former Corporate Vice

10   President allegedly confirmed that AXT failed to perform full testing of its products and lacked the

11   right equipment for testing.  (Comp., ¶¶ 78–80.)

12       Plaintiff alleges that during the Class Period, Defendants reported that one of the Company's

13   larger customers, Agilent, had canceled its orders with AXT because AXT was shipping products

14   that did not conform to Agilent's specifications.  Defendants characterized the shipping of out-of-

15   spec products as a one-time event even though, according to Plaintiff, AXT had shipped products

16   that did not meet customer specifications to many of its customers.  (*Id.*, ¶ 86.)

17                                              ---

18       On May 20, 2005, Defendants filed the instant motion to dismiss pursuant to the Private

19   Securities Litigation Reform Act of 1995 ("PSLRA"), and Rules 9(b) and 12(b)(6) of the Federal

20   Rules of Civil Procedure, on the grounds that Plaintiff has failed to plead his allegations with

21   sufficient particularity.

22                              **LEGAL STANDARD**

23   **A.    Federal Rules of Civil Procedure**

24       A court may dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for the

25   pleading of insufficient facts under an adequate theory.  *Robertson v. Dean Witter Reynolds, Inc.,*

26   749 F.2d 530, 533-34 (9th Cir. 1984).  When deciding upon a motion to dismiss pursuant to Rule

27

28       [3] In his Complaint, Plaintiff does not allege that the third confidential witness - the tester of
     returned AXT products – was ever an AXT employee.  In his opposition to the instant motion, however,
     Plaintiff describes this witness as a former AXT employee.

12(b)(6), a court must take all of the material allegations in the plaintiff's complaint as true, and construe them in the light most favorable to the plaintiff. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

In the context of a motion to dismiss, review is limited to the contents in the complaint. *Allarcom Pay Television, Ltd. v. General Instrument Corp.*, 69 F.3d 381, 385 (9th Cir. 1995). When matters outside the pleading are presented to and accepted by the court, the motion to dismiss is converted into one for summary judgment. However, matters properly presented to the court, such as those attached to the complaint and incorporated within its allegations, may be considered as part of the motion to dismiss. *See Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989). Where a plaintiff fails to attach to the complaint documents referred to therein, and upon which the complaint is premised, a defendant may attach to the motion to dismiss such documents in order to show that they do not support the plaintiff's claim. *See Pacific Gateway Exchange*, 169 F. Supp. 2d at 1164; *Branch v. Tunnell*, 14 F.3d 449, 44 (9th Cir. 1994) (overruled on other grounds). Thus, the district court may consider the full texts of documents that the complaint only quotes in part. *See In re Stay Electronics Sec. Lit.*, 89 F.3d 1399, 1405 n.4 (1996), *cert denied*, 520 U.S. 1103 (1997). This rule precludes plaintiffs "from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." *Parrino v. FHP, Inc.*, 146 F.3d 699, 705 (9th Cir. 1998).

Rule 8(a) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Accordingly, motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6) are typically disfavored; complaints are construed liberally to set forth some basis for relief, as long as they provide basic notice to the defendants of the charges against them. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 1248, 1257 (N.D. Cal. 2000). Where a plaintiff alleges fraud, however, Rule 9(b) requires the plaintiff to state with particularity the circumstances constituting fraud. To meet the heightened pleading requirements of Rule 9(b), the Ninth Circuit has held that a fraud claim must contain three elements: (1) the time, place, and content of the alleged misrepresentations; and (2) an explanation as to why the statement or omission complained of was false or misleading. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541,

United States District Court
For the Northern District of California

1  1547–49 (9th Cir. 1994).

2          In the securities context, the pleading requirements are even more stringent.

3  ///

4  **B.      Private Securities Litigation Reform Act**

5          In 1995, Congress enacted the PSLRA to provide "protections to discourage frivolous

6  [securities] litigation." H.R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (Nov. 28, 1995).

7  The PSLRA strengthened the already-heightened pleading requirements of Rule 9(b).  Under the

8  PSLRA, actions based on allegations of material misstatements or omissions must "specify each

9  statement alleged to have been misleading, the reason or reasons why the statement is misleading,

10 and, if an allegation regarding the statement or omission is made on information and belief, the

11 complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-

12 4(b)(1).

13         The PSLRA also heightened the pleading threshold for causes of action brought under

14 Section 10(b) and Rule 10b-5.  Specifically, the PSLRA imposed strict requirements for pleading

15 scienter.  Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong

16 inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The

17 Ninth Circuit, in interpreting the PSLRA, has held that "a private securities plaintiff proceeding

18 under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of

19 deliberately reckless or conscious misconduct." *In re Silicon Graphics Inc.*, 183 F.3d 970, 974 (9th

20 Cir. 1999).  If the complaint does not satisfy the pleading requirements of the PSLRA, upon motion

21 by the defendant, the court must dismiss the complaint. *See* 15 U.S.C. §78u-4(b)(1).

22         The PSLRA's Safe Harbor provision provides that a securities fraud claim may not lie with

23 respect to a statement that is "identified as a forward-looking statement, and is accompanied by

24 meaningful cautionary statements identifying important factors that could cause actual results to

25 differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(I).

26 However, a person may be held liable if the forward-looking statement is made with "actual

27 knowledge . . . that the statement was false or misleading." 15 U.S.C. §  78u-5(c)(1)(B); *No. 84*

28 *Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d

United States District Court
For the Northern District of California

1   920, 936 (9th Cir. 2003); *but see In re Seebeyond Technologies Corp. Sec. Litig.*, 266 F. Supp. 2d

2   1150, 1164-65 (C.D. Cal. 2003) (disagreeing with the analysis in *America West* and finding that a

3   defendant is immune from liability if it satisfies either 15 U.S.C. § 78u- 5(c)(1)(A) or (B)).

**ANALYSIS**

4

5   **I.     Request For Judicial Notice**

6          As a threshold matter, the Court addresses Defendants' request that the Court take judicial

7   notice of thirteen separate documents, eleven of which are expressly referenced in Plaintiff's

8   Complaint and two of which are not.  Plaintiff does not object to Defendants' request.

9   **A.     Documents Referenced in Complaint**

10         Defendants ask the Court to judicially notice the following documents incorporated by

11   reference in Plaintiff's Complaint:  AXT's 10-Ks for the fiscal years ended December 31, 2000,

12   December 31, 2002, and December 31, 2003; five AXT press releases, respectively dated February

13   6, 2002, October 23, 2002, February 5, 2003, April 23, 2003, and February 4, 2004; AXT's 10-Qs

14   for the quarters ended June 30, 2003, and September 30, 2003; and AXT's Current Report on SEC

15   Form 8-K, filed on June 24, 2004.  These documents are attached to the Declaration of David Banie

16   as Exhibits A–K.

17         Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to

18   reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources

19   whose accuracy cannot reasonably be questioned."  Even where judicial notice is not appropriate,

20   courts may also properly consider documents "whose contents are alleged in a complaint and whose

21   authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings."

22   *Branch v. Tunnel*, 14 F.3d 449, 454 (9th Cir. 1994).

23         Here, each of the documents described above is explicitly incorporated by reference in

24   Plaintiff's Complaint.  (*See* Complaint, ¶¶ 32, 40, 48, 50, 51, 54, 57, 59, 60, 61, 71.)  Moreover, the

25   documents are press releases and SEC filings, both of which are judicially noticeable in this context.

26   *See In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 814, 817 (N.D. Cal. 2004) (the court may

27   take judicial notice of press releases); *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1076

28   (N.D. Cal. 2003) (the court may take judicial notice of public filings).  Accordingly, the Court

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

1    **GRANTS** Defendants' request and takes judicial notice of Exhibits A–K to the Banie Declaration.

2    ///

3    ///

4    **B.    Documents Not Referenced in Complaint**

5        **1.    Exhibit L – SEC Form 4 filed by Defendant Young**

6        Defendants ask the Court to take judicial notice of SEC Forms 4 filed on behalf of Defendant

7    Young.  These documents are attached to the Banie Declaration as Exhibit L.  "In a securities action,

8    a court may take judicial notice of public filings when adjudicating a motion to dismiss . . . ."

9    *Calpine*, 288 F. Supp. 2d at 1076.  The SEC Forms 4 at issue here are publicly-available documents

10   filed with the SEC.  Accordingly, the Court takes judicial notice of the documents attached as

11   Exhibit L to the Banie Declaration.[4]

12       **2.    Exhibit M – AXT's Closing Stock Prices From February 6, 2001, Through April**
13           **29, 2004**

14       Defendants also urge the Court to take judicial notice of documents reflecting AXT's closing

15   stock prices during the Class Period.  These documents are attached to the Banie Declaration as

16   Exhibit M.  In the context of a motion to dismiss a securities private fraud action, a court may take

17   judicial notice of a company's public stock prices.  *Homestore.com*, 347 F. Supp. 2d at 816.

18   Accordingly, the Court takes judicial notice of these documents.

19   **II.    Motion to Dismiss**

20       Defendants contend that Plaintiff's Complaint should be dismissed because Plaintiff fails to

21   satisfy the heightened pleading requirements under the PSLRA, fails to state a claim under Rule

22   12(b)(6), and fails to plead fraud with the particularity required by Rule 9(b).  The Court examines

23   Plaintiff's two claims separately.

24   _____

25       [4] Defendants also contend that Exhibit L should be judicially noticed for two other independent reasons. First, the Complaint references Defendant Young's sale of 200,000 shares of AXT stock during

26   the Class Period.  According to Defendants, this is information that Plaintiff could only have obtained from reviewing Young's Forms 4, such that the documents are incorporated by implicit reference in the

27   Complaint and should be judicially noticed.  Second, the Forms 4 are central to Plaintiff's allegation that Defendant Young's Class Period stock sales are probative of scienter, and should be judicially noticed

28   on that ground.  Having already determined that the Forms 4 should be judicially noticed on the ground that they are public documents, the Court declines to address Defendants' separate grounds for judicial notice.

**A.      Plaintiff's First Cause of Action – Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5**

Section 10(b) of the Securities Exchange Act (the "Act") provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).  Rule 10b-5, promulgated under Section 10(b), makes it unlawful for any person to use interstate commerce:  (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5.

For a claim under Section 10(b) and Rule 10b-5 to be actionable, a plaintiff must allege:  (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the alleged loss.  *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999).  A complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(2).  As discussed above, in order to avoid having the action dismissed, a plaintiff must "plead with particularity both falsity and scienter."  *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  The Ninth Circuit, in *Ronconi*, articulated the rule as follows:

> Because falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, we have incorporated the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry.  In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), we must determine whether 'particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] 'deliberate recklessness' made false or misleading statements to investors.'  Where pleadings are not sufficiently particularized or where, taken as a whole, they do not raise a 'strong

*United States District Court*
For the Northern District of California

1    inference' that misleading statements were knowingly or [with] deliberate
     recklessness made to investors, a private securities fraud complaint is properly
2    dismissed under Rule 12(b)(6).

3    *Id*. (citations and internal quotation marks omitted).

4         Here, Plaintiff alleges that statements or omissions attributable to Defendant AXT and

5    Defendant Young were false and misleading and that Defendants knew the statements were false and

6    misleading at the time the statements were made.  The statements at issue can be separated into two

7    general categories:  (1) statements touting the quality of AXT's products and the Company's ability

8    to meet customer specifications; and (2) AXT's financial statements.  With respect to both

9    categories of statements, Defendants contend that Plaintiff has failed to plead the falsity of the

10   statements with sufficient particularity and has failed to plead facts that, if true, would raise a strong

11   inference that Defendants acted with scienter.  Additionally, Defendants assert that Plaintiff has

12   failed to adequately plead loss causation pursuant to the Supreme Court's recent holding in *Dura*

13   *Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627 (2005).

14        **1.      FALSITY and SCIENTER**

15             **a.      Quality Statements**

16        Plaintiff alleges that Defendants made false or misleading statements regarding the quality of

17   its products throughout the Class Period.  Specifically, Plaintiff takes issue with the statements

18   contained in various press releases issued between February 6, 2001, and April 27, 2004, in which

19   Defendants reported that its products were of high quality, incorporated strong engineering design,

20   had competitive advantage, contained superior features, and met customers' specific requirements.

21   To support his claim that the quality statements were knowingly false or misleading, Plaintiff relies

22   on AXT's May 24, 2004, press release disclosing that the Company had "not followed requirements

23   for testing of products and provision of testing data and information relating to customer

24   requirements for certain shipments made over the past several years," and on the Company's

25   subsequent decisions to reassign its CEO, to increase its reserve for sales returns by $745,000, and to

26   record a $2.1 million charge for obsolete inventory manufactured in the prior two and three years.

27   Plaintiff construes AXT's May 2004 statements and conduct as an admission by Defendants that the

28   quality statements were knowingly false when made.  Plaintiff also relies on the statements of the

United States District Court

For the Northern District of California

1   former AXT Quality Technician, the former AXT Corporate Vice President, and the former tester of

2   returned AXT products (collectively, the "witnesses") to support falsity and scienter.  Finally,

3   Plaintiff claims that the fact that Agilent, one of AXT's customers, canceled its orders for AXT

4   substrates during the Class Period corroborates the witness statements and Plaintiff's claims that the

5   quality statements were knowingly false.

6        Defendants contend that the product quality statements were, at most, mere puffery, and are

7   not actionable.  In the alternative, Defendants argue that Plaintiff has not pled sufficiently

8   particularized facts that the statements were false or misleading when made nor has Plaintiff pled

9   facts that raise a strong inference of scienter.  The Court addresses each of Defendants' arguments in

10  turn.

11                    **i.        Puffery**

12       "General statements of optimism and 'puffing' about a company or product are not

13  actionable."  *In re Foundry Networks, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 18200, *47 (N.D. Cal.

14  Aug 29, 2003) (citation omitted).  "Vague, amorphous statements, like 'soft forecasts' which are

15  'mere puffery,' are inactionable because reasonable investors do not consider 'soft' statements or

16  loose predictions important in making investment decisions."  *Id.* (citation omitted).  "No matter

17  how untrue a statement may be, it is not actionable if it is not the type of statement that would

18  significantly alter the total mix of information available to investors."  *Id.* (citing *In re Apple

19  Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1025 (N.D. Cal. 2002)).  In *Foundry Networks*, at

20  issue was the company's statement that its "business remains on track."  The court held that the

21  statement was inactionable puffery because the statement was merely a very general statement of

22  optimism about the company's financial prospects, something that reasonable investors would not

23  rely on when making investment decisions.  In *No. 84 Employer-Teamster Joint Council Pension

24  Trust Fund v. Am. W. Holding Corp.*, 320 F. 3d 920 (9th Cir. 2003) ("*America West*"), however, the

25  Ninth Circuit found statements at issue were not inactionable puffery.  Specifically, the court held

26  that "[a] reasonable investor would find significant the information regarding a company's deferred

27  maintenance costs, unsafe maintenance practices, and possible sanction" because "a reasonable

28  investor would consider the potential effects of each of these facts on the overall economic health of

14

the company as 'significantly altering' the 'total mix' of information made available." *Id*. at 935; *see also Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175 (D.R.I. 2003) (statement that company was the "'premier provider of high-speed DSL services in the Northeast corridor' . . . is much more than mere puffery; it is a statement of [the company's] present status and capabilities, and connotes that [the company] is comparatively superior")).

The lion's share of the statements at issue here appear to more closely resemble the statements at issue in *America West* or *Scritchfield* than those at issue in *Foundry Networks*. For example, statements touting the superiority of AXT's specific products, such as the October 24, 2001, press release described in paragraph 38 of the Complaint, in which AXT reported that the Company's "VGF gallium arsenide and indium phosphide substrates continue to offer superior features for manufacturers of high quality electronic and opto-electronic devices" are far less generalized than the statements the *Foundry Networks* court determined were inactionable. Such statements strike the Court as information that an investor would consider when making investment decisions. However, to make such a determination would require the Court to make factual findings which, at this stage in the litigation, would not be appropriate. Accordingly, the Court finds that whether the quality statements at issue here are actionable as material statements is a question for another day.

### ii.     Falsity and Scienter Not Sufficiently Pled

Assuming, *arguendo*, that the quality statements at issue were not mere puffery and are actionable as material statements or omissions, the Court now turns to the question of whether Plaintiff has alleged sufficiently particularized facts to support his claim that the quality statements were false or misleading, and whether Plaintiff has alleged facts that raise a strong inference of scienter, to survive Defendants' motion to dismiss.

Plaintiff primarily relies on AXT's post-Class Period (May 2004) disclosure and the statements of three confidential witnesses to support his claim that the product quality statements were false or misleading and that Defendants knew those statements were false and misleading when made. Plaintiff also alleges that Agilent's cancellation of its order of AXT products during the Class Period supports his claims of falsity and scienter. Additionally, Plaintiff alleges that Defendant

United States District Court
For the Northern District of California

1    Young's sale of stock during the Class Period supports an strong inference of scienter.  For the

2    following reasons, the Court finds that the facts, as pled, are insufficiently particularized to support

3    Plaintiff's claim that the quality statements violated federal securities laws.

4    ///

5                    (a)        **Witness Statements[5]**

6              According to Plaintiff, the former Quality Technician allegedly confirmed that the Company

7    knowingly shipped to customers products that did not meet customer specifications, that the

8    Company was aware that the products would be returned, and that almost every shipment was, in

9    fact, returned.  Specifically, the technician said that when AXT conducted specification checks on its

10   wafers for various criteria, the wafers never met all the specifications.  The former tester of returned

11   AXT products allegedly confirmed that the passivation layer (the top protective layer) on AXT's

12   LEDs was consistently weak, making the LEDs easily and irreparably damaged.  The tester

13   allegedly said that AXT knew this was a problem and lacked adequate product testing equipment.

14   The former Corporate Vice President allegedly confirmed that AXT failed to perform full testing of

15   its products and lacked the right equipment for testing.  (Comp., ¶¶ 78–80.)  These statements, as

16   currently pled, are insufficient to satisfy create a sufficient factual predicate for Plaintiff's claims

17   under the PSLRA.        First, Plaintiffs' Complaint fails to explain how any of the witnesses would

18   have personal and firsthand knowledge of the facts they allege to be true.  *See In re Daou Sys., Inc.*

19   *Sec. Litig.*, 411 F.3d 1006, (9th Cir. 2005) (confidential sources must be described "with sufficient

20   particularity to support the probability that a person in the position occupied by the source would

21   possess the information alleged").  For example, Plaintiff does not explain the job responsibilities of

22   the Quality Technician and how he or she would know about the number or proportion of returns of

23   AXT's products.  Second, the Complaint fails to point to any specific data to support the witnesses'

24   contentions that AXT's products were being returned.  Third, the Complaint does not sufficiently

25   describe the timing of the witnesses' observations and conclusions.  Finally, assuming, as the Court

26   must, that the witnesses' statements are true and AXT's products were consistently not being tested,

27   _____

28        [5] For purposes of this analysis, the Court assumes that the witnesses' purported statements are
true since, at this stage in the proceedings, the Court must view all facts in the light most favorable to
Plaintiff.

**United States District Court**
For the Northern District of California

1  did not meet customer specifications, and were regularly being returned to the Company, the

2  Complaint alleges no facts that would allow the Court to infer that Defendants were aware of these

3  facts.  The Complaint does not allege any process by which upper management, presumably in

4  charge of issuing or approving press releases, would have been aware of product returns or testing

5  practices at the manufacturing level, much less how each of these particular confidential witnesses

6  was connected with Defendants such that they had contemporaneous knowledge of what AXT and

7  Defendant Young knew.  Accordingly, the witness statements are insufficient, as currently pled, to

8  support falsity and scienter here.

9  　　　　　　　　**(b)　　AXT's Post-Class Period Statements and Conduct**

10  　　　Plaintiff contends that AXT's May 24, 2004, disclosure notifying the public that AXT had

11  "not followed requirements for testing of products and provision of testing data and information

12  relating to customer requirements for certain shipments made over the past several years" supports

13  his contention that the quality statements issued during the Class Period were false and misleading

14  and that Defendants were aware the statements were false and misleading.  The Court disagrees.

15  　　　The May 2004 disclosure does not say that every shipment of every AXT product was non-

16  conforming such that it can be considered an admission that AXT's Class Period statements

17  regarding the quality of its products are rendered false and misleading.  Even if the May 2004

18  statement admits that some of AXT's products did not conform to customer specifications, the

19  statements at issue could still have been true in that the Company only claimed that its products were

20  competitive and that its products' design was strong.  Moreover, even assuming the statements were

21  false or misleading, the post-Class Period disclosure does not raise a strong inference of scienter

22  here.  The fact that the Company admitted, after the Class Period, that it had failed to follow testing

23  requirements on "certain shipments," is insufficient to raise a strong inference that Defendants knew,

24  at the time the quality statements were made, that the statements were false or misleading.

25  　　　　　　　　**(c)　　Agilent Cancels Orders**

26  　　　Plaintiff alleges that during the Class Period, Defendants disclosed that one of AXT's larger

27  customers, Agilent, had canceled its orders for AXT products because AXT was shipping products

28  that did not conform to Agilent's specifications.  Plaintiff contends that this corroborates his

1    contention (and the confidential witness statements) that AXT was aware that it was shipping non-

2    conforming products to its customers such that the statements it issued during the Class Period

3    regarding the quality of its products and its competitive position in the marketplace were knowingly

4    false and misleading.  Plaintiff also contends that Defendants were aware that the problems with the

5    Agilent shipments were not unique such that its statement to the contrary was false and misleading.

6    Plaintiff has failed to allege any facts that support a finding that Defendants knew that the non-

7    conforming Agilent shipments were part of a widespread quality problem with AXT products.

8    Accordingly, the Court finds that the fact that Agilent canceled its orders with AXT is insufficient to

9    demonstrate that the quality statements were knowingly false when made.

10                              **(d)      Defendant Young's Stock Sales**

11          Plaintiff also relies on the stock sales of Defendant Young as an indication of Defendants'

12    scienter with respect to the quality statements.  Generally, stock sale allegations cannot raise an

13    inference of scienter unless the plaintiff alleges specific facts showing that the sales were

14    "dramatically out of line with prior trading practices at times calculated to maximize the personal

15    benefit from undisclosed inside information."  *Silicon Graphics*, 183 F.3d at 986.  Among the

16    relevant factors for a court to consider are:  1) the amount and percentage of shares sold by insiders;

17    2) the timing of the sales; and 3) whether the sales were consistent with the insider's prior trading

18    history.  *Id*.

19          Here, Plaintiff alleges that Defendant Young sold a total of more than 200,000 shares of his

20    personally-held AXT stock during the Class Period for gross proceeds of approximately $2.2

21    million.  (Comp. at ¶ 91.)  Plaintiff alleges no facts about the dates, prices per share, or sizes of each

22    of Defendant Young's Class Period sales.  Plaintiff also fails to allege that Defendant Young's sales

23    over the time period in question were inconsistent with his prior trading history.  In light of the three

24    factors above, Defendant Young's Class Period sale of stock, as alleged, is not sufficiently

25    suspicious, without more, to raise a strong inference of scienter.

26                              **(e)      Plaintiff's Allegations as a Whole**

27          The Court must consider whether the totality of Plaintiff's allegations, even though

28    individually lacking, are sufficient to create a strong inference that Defendants issued allegedly false

**United States District Court**
For the Northern District of California

18

or misleading statements touting the quality of AXT's products with deliberate recklessness, if not

actual knowledge. *Lipton*, 284 F.3d at 1038. Here, the sum is no greater than its parts. Plaintiff has

failed to allege particularized facts that could lead the Court to infer that Defendants intentionally, or

with deliberate recklessness, misrepresented the quality of AXT's products and its strategic position

as compared with other manufacturers of similar products. Because Plaintiff's first cause of action

"lacks sufficient detail and foundation necessary to meet either the particularity or strong inference

requirements of the PSLRA," it must be dismissed. *Silicon Graphics*, 183 F.3d at 984.

### b.    Financial Statements

Plaintiff alleges that during the Class Period, Defendants knowingly issued financial

statements that overstated revenue, growth margins, and earnings in violation of GAAP, rendering

the statements false and misleading under the Securities and Exchange Act. Specifically, Plaintiff

contends that the financial statements were knowingly false or misleading in light of: (1) the

Company's stated revenue recognition policy requiring that AXT not recognize revenue where there

is a customer acceptance requirement or remaining significant obligation; (2) AXT's failure to

accrue adequate reserves; and (3) AXT's failure to take a timely charge for inventory obsolescence.

Plaintiff also challenges the qualitative statements regarding internal and disclosure controls

contained in the Sarbanes-Oxley certifications accompanying AXT's quarterly filings (beginning in

April 2002). In support of these allegations, Plaintiff again relies primarily upon the Company's

May 2004 disclosure and its subsequent decisions to increase its reserves, charge for inventory

obsolescence, and reassign its CEO. Plaintiff also again relies on the confidential witness

statements, Agilent's decision to cancel its order, and Defendant Young's stock sales. Defendants

argue that Plaintiff has failed to allege a particularized factual basis for his claim that the financial

statements released during the Class Period were false and involved an improper recognition of

revenue, or that Plaintiff has alleged facts raising a strong inference that Defendants acted with the

requisite scienter. The Court agrees.

It is generally accepted that standing alone, allegations of GAAP violations do not establish

scienter. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994). Rather, to plead

fraudulent intent based on GAAP violations, plaintiffs must allege facts showing that: (1) specific

1   accounting decisions were improper; and (2) the defendants knew specific facts at the time that

2   rendered their accounting determinations fraudulent.  *DSAM Global Value Fund v. Altris Software,*

3   *Inc.*, 288 F.3d 385, 390–91 (9th Cir. 2002).  Plaintiff has not met this standard.  As discussed *supra*,

4   Plaintiff only alleges that Defendants *must have been* aware that its products were flawed and were

5   being shipped to customers anyway based on the vague representations of three confidential

6   witnesses who do not describe the basis for their knowledge, the time period of the general

7   awareness that this practice was occurring, any contact with AXT's upper management (or

8   specifically, those making the accounting and revenue recognition decisions), or any specific

9   transactions on which revenue was knowingly improperly recorded.  *See Northpoint*, 184 F. Supp.

10  2d at 998 ("With accounting fraud, . . . the necessary scienter is in general not established merely by

11  the publication of inaccurate accounting figures, or failure to follow generally accepted accounting

12  principles.  More is needed.")  Plaintiff has failed to allege that particular accounting decisions were

13  improper or facts that support a strong inference that Defendants were aware of facts that rendered

14  their accounting decisions fraudulent.  In sum, Plaintiff's generic allegations of accounting fraud fall

15  short of sufficiently pleading scienter with respect to Defendants' practice of recognizing revenue.

16      The other factors upon which Plaintiff relies to support his claim that AXT's financial

17  statements were false or misleading are also insufficiently pled.  The Court examines these in turn.

18          **i.      AXT's Post-Class Period Statements and Conduct**

19      Plaintiff claims that AXT's post-Class Period decisions to take a $745,000 reserve, to take a

20  $2.1 million write-off, and to reassign its CEO and promote its CFO to the top spot at the Company,

21  demonstrate that the Company's financial statements, issued during the Class Period, were false

22  when made and that Defendants knew they were false.  The Court disagrees.  These allegations are

23  not pled with the requisite particularity.  Plaintiff contends that AXT's post-Class Period decisions

24  suggest that the Company should have increased its reserve for returns by $745,000 *during* the Class

25  Period and that the Company's failure to do so renders the financial statements false.  Plaintiff

26  alleges no contemporaneous facts to support that contention other than the post-Class Period

27  decision to increase the reserves.  This is a classic example of pleading fraud by hindsight, which is

28  exactly what Congress intended to eliminate with its adoption of the PSLRA.  *See Silicon Graphics,*

United States District Court

For the Northern District of California

183 F. 3d at 988; *Acito v. IMCERA Group*, 47 F. 3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.") Similarly, AXT's decision to write off $2.1 million for inventory obsolescence after the close of the Class Period does not necessarily read back on what the Company should have done, but did not do, during the Class Period, or on the falsity of the Company's financial statements during that period. A "pleading must provide some particularized support regarding inventory levels, the defendants' knowledge, and approximately when [the] plaintiffs think the write-down should have occurred." *In re PETsMART, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 993 (D. Ariz. 1999). Plaintiff fails to do so here. Additionally, AXT's decision to reassign Defendant Young to head up the Company's China Operations does not support an inference of scienter here. Management changes "are not in and of themselves evidence of scienter. Most major stock losses are often accompanied by management departures, and it would be unwise for courts to penalize directors for these decisions." *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1092 (N.D. Cal. 2005). Plaintiff has not alleged sufficiently particularized facts with respect to Young's reassignment to support his claim that the financial statements were false when made.

Plaintiff also contends that the Sarbanes-Oxley certifications signed by Defendant Young and filed with the SEC were false when made. Again, the Court finds that Plaintiff has not alleged particularized facts to support his claim that Defendant Young's averments that he had examined the Company's internal disclosure controls and believed they were adequate, were false.

### ii. Witness Statements[6]

As discussed above, the confidential witness statements relied on by Plaintiff here are insufficient, as currently pled, to support falsity or scienter. The Complaint fails to allege how the witnesses would have known what accounting effect, if any, product returns would have on the Company's financial statements, or how Defendants would have known that the financial statements it released were false or misleading in light of the alleged product returns. *See Juniper Networks, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 4025, at *8 (N.D. Cal. Mar. 11, 2004) (allegations of false

---

[6] For purposes of this analysis, the Court assumes that the witnesses' purported statements are true since, at this stage in the proceedings, the Court must view all facts in the light most favorable to Plaintiff.

financial forecasts are insufficient where plaintiffs failed to "plead specific facts demonstrating how the problems being experienced translated into the need for Juniper to alter or reduce its publicly issued projections").  Accordingly, the confidential witness statements, as currently pled, are insufficient to support falsity and scienter with respect to the financial statements.

### iii.    Agilent Cancels Order

Plaintiff contends that AXT's announcement, during the Class Period, that Agilent had canceled its orders due to AXT's failure to provide products that met Agilent's specifications supports his claim that the financial statements were false when made and that Defendants knew the statements were false.  While the Agilent order withdrawal suggests that AXT was not *always* shipping products that conformed to customer specifications, Plaintiff fails to allege sufficiently particularized facts that support his claim that this meant that the financial statements were false or that Defendants knew they were false.

### iv.    Defendant Young's Stock Sales

As discussed *supra*, Plaintiff fails to allege sufficient details regarding Defendant Young's sales of stock during the Class Period that would support the falsity of the financial statements and Defendants' scienter with respect thereto.

### v.    Plaintiff's Allegations as a Whole

As explained above, the Court must consider whether the totality of Plaintiff's allegations, even though individually lacking, are sufficient to create a strong inference that Defendants issued allegedly false or misleading financial statements with deliberate recklessness, if not actual knowledge.  *Lipton*, 284 F.3d at 1038.  Here, again, the sum is no greater than its parts.  *See In re Nash Finch Co. Sec. Litig.*, 323 F. Supp. 2d 956, 964 & n.9 (D. Minn. 2004) ("The Court finds the collective minutia offered here adds up to nothing.  Just as two plus two will never equal five, these allegations – whether considered apart or together – do not add up to a strong inference of

United States District Court
For the Northern District of California

22

United States District Court

For the Northern District of California

1    scienter.")[7]

2        **2.    Loss Causation**

3        In *Dura Pharmaceuticals*, the Supreme Court clarified that alleging that a misrepresentation

4    caused an inflated purchase price does not, without more, demonstrate loss causation.  To "touch

5    upon" an economic loss is insufficient; plaintiffs must demonstrate an actual causal connection

6    between the defendant's alleged material misrepresentation and the economic loss suffered.  125 S.

7    Ct. at 1633.  This holding reversed the Ninth Circuit's jurisprudence on the subject, pursuant to

8    which a plaintiff could satisfy the loss causation requirement simply by alleging that stock price was

9    inflated due to the alleged misrepresentation.

10       Here, the Complaint simply states that because AXT's stock prices dropped significantly

11   after the Company disclosed its internal investigation, Plaintiff, and other AXT shareholders who

12   purchased stock during the Class Period, lost money.  However, Plaintiff has not alleged a

13   proximate, causal connection between the alleged misrepresentations contained in AXT's press

14   releases and financial statements and the consequent decline in AXT stock.  Because other factors

15   may have affected the Company's stock price during the Class Period, Plaintiff must allege more

16   than just that the alleged misrepresentations inflated the stock price.  *See id*.  This is particularly true

17   here where the AXT stock price fluctuated significantly during the Class Period, at some points

18   dropping lower than the price of the stock after the April 27, 2004, disclosure regarding the

19   Company's internal investigation.[8]  This suggests that the stock price was, indeed, affected by

20   factors other than Defendants' alleged false or misleading statements.  Accordingly, the Court finds,

21   in light of *Dura*, that Plaintiff's allegations regarding loss causation are insufficient.  Plaintiff's

22

23       [7] At oral argument, Plaintiff alerted the Court to the recent holding in *In re Omnivision
     Technologies, Inc.*, 2005 U.S. Dist. LEXIS 16009, *1 (N.D. Cal. July 29, 2005).  The Court finds that
24   that case, distinguishable on its facts, does not alter the Court's conclusions here.  In *Omnivision*, it was
     undisputed that the company's financial statements contained errors.  This is not the case here.
25   Additionally, in that case, the plaintiff alleged facts supporting a finding that the individual defendants,
     executives of the company in question, sold personal shares of the company's stock dramatically out
26   of line with their trading history.  That the *Omnivision* court found that the plaintiff's complaint survived
     the defendants' motion to dismiss, despite the PSLRA's heightened pleading standard, does not mandate
     the same result here.
27

28       [8] On April 29, 2004, AXT's stock price dropped to $2.20 per share.  Although the price had, at
     various points during the Class Period, been as high as $40 per share, there was a substantial period of
     time during the Class Period in which AXT's stock price dropped below $2 per share.

contention that the *Daou* case mandates the contrary result is specious. In that case, the Ninth Circuit found that loss causation was sufficiently pled but specifically held that because the complaint disclosed that the price of the company's stock had declined, during the class period, from $34.375 per share to $18.50 per share, before any corrective disclosure was issued, any loss suffered between those figures could "not be considered causally related to Daou's allegedly fraudulent accounting methods because before the revelations began . . . , the true nature of Daou's financial condition had not yet been disclosed." 411 F.3d at 1026–27. Likewise, AXT's stock price dipped below the price to which it ultimately fell after the April 2004 disclosure, thus rendering Plaintiff's attempt to causally link the alleged false statements with his (and other purported class members') financial loss insufficiently pled.

**B.      Plaintiff's Second Cause of Action – Violation of Section 20(a)**

Section 20(a) of the Securities Exchange Act ("Exchange Act") provides derivative liability for those who control others found to be primarily liable under the Act. *In re Ramp Networks, Inc. Sec. Lit.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Where a plaintiff asserts a Section 20(a) claim based on an underlying violation of Section 10(b), the pleading requirements for both violations are the same. *Id.* "To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act." *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999).

Here, Plaintiff alleges that Defendant Young acted as a controlling person of AXT within the meaning of Section 20(a) of the Act and is liable thereunder for the conduct alleged. Plaintiff claims that by virtue of Defendant Young's position as CEO and Chairman of the Board of the Company, he was responsible for preparing and disseminating AXT's public releases and had the power and the authority to cause the Company to engage in the wrongful conduct complained of. Defendants argue that Plaintiff's Section 20(a) cause of action fails because Plaintiff has failed to state a cause of action pursuant to Section 10(b). The Court agrees. Because Plaintiff has failed to adequately plead the underlying 10(b) violation, as discussed *supra*, Plaintiff's Section 20(a) claim must also be dismissed.

**CONCLUSION**

United States District Court

For the Northern District of California

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss without prejudice.  Plaintiff must file an amended complaint within thirty days of the date of this Order. This Order terminates docket entry nos. 24 and 25.

**IT IS SO ORDERED.**



Dated: September_21_, 2005

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

25